# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

| | | |
|---|---|---|
| MELINDA HART, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | No. 4:17cv00407-JJV |
| | * | |
| CITY OF KENSETT, ARKANSAS, *et al.*, | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER

Plaintiff, Melinda Hart, brings claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("Rehab Act"), and the Arkansas Civil Rights Act of 1993 ("ACRA") for disability discrimination, hostile work environment, failure to accommodate, constructive discharge, and retaliation. She also brings a state tort claim of outrage against Defendant Teague. (Doc. No. 1.)

Defendants have moved for summary judgment claiming: 1) Plaintiff's claims under the ADA are time barred; 2) the official capacity claims against Defendants Teague and Edge are redundant since the City of Kensett is already a party to this action; 3) there is no direct evidence of unlawful discrimination based on disability; 4) Plaintiff has failed to establish a *prima facie* case of disability discrimination for purposes of the ADA, ACRA, and Rehab Act; 5) and Plaintiff has failed to establish a *prima facie* showing of hostile work environment and the tort of outrage. (Doc. Nos. 19-21.) Plaintiff has responded (Doc. Nos. 22-23) and Defendants have replied. (Doc. No. 24.) After careful review and for the following reasons, I find Defendants' Motion for Summary Judgment should be GRANTED in part and DENIED in part. Although I find Defendant's Motion should be denied in part, I find this cause of action should be DISMISSED.

I.      **SUMMARY JUDGMENT STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A).

When ruling on a motion for summary judgment, courts must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).  The nonmoving party may not rely on allegations or denials but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).  The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

II.     **FACTS**

Plaintiff worked for the City of Kensett as a Court Clerk and City Clerk from August 2014 to January 6, 2016.  (Doc. No. 22 at 1.)  Max Donald was the Mayor at the time of Plaintiff's hiring, but in January 2015, Alan Edge became Mayor.  (*Id.* at 2.)  Maxine Teague was the City's

elected Recorder/Treasurer from January 2013 to December 2016.  (*Id.*)  From August 2014 to December 2014, Plaintiff had no significant issues with Ms. Teague.  (*Id.*)  In December 2014, Ms. Hart's relationship with Ms. Teague became strained.  (*Id* at 3.)  Ms. Hart testified, "Ms. Teague was working two jobs.  She was taking care of an elderly lady.  And the other lady that was working with her would call her all the time and ask her how to, was constantly on her, and I don't know if that's what made her be constantly on me."  (Doc. No. 21-1 at 8.)  Ms. Hart described "constantly on me" as, "She would, she talked down to me and hollered at me and she would throw papers on my desk, and files, and be rude, and I don't know why that our relationship changed at that point."  (*Id.*)

In March 2015, Ms. Hart suffered a stroke and, although she performed many of her duties on a part-time basis, she did not return to full-time duty until September 2015.  (Doc. No. 22 at 4-5.)  Upon returning to full-time duty, Ms. Teague "told her that she needed to quit and go file for disability."  (*Id.* at 5.)  Ms. Hart was able to perform all her required job duties after her stroke, but her relationship with Ms. Teague continued to deteriorate.  (*Id.* at 5-6.)  The relationship between the two had deteriorated to the point where Ms. Teague "had printed some Family Medical Leave Act ("FMLA") papers and slammed them on her desk, and screamed and hollered at her to read them, whereby Ms. Hart "yelled back" and then went to the emergency room because she thought she was suffering a second stroke.  (*Id.* at 6-7.)

Ms. Hart recounted the events as follows:

The second time, I don't remember the date but it was after the city council meeting where she had asked about the FMLA and Judge Mills told her that the City of Kensett doesn't fall under FMLA laws, so that we were only under the city handbook. And so that was if the mayor decided to keep me as an employee, then that's all that mattered, was that the mayor decided that he was going to keep me on as an employee, so - - And she got upset about that because she wanted me gone, because she didn't like that he was still letting me get my sick pay and vacation

pay, and that they was still paying my insurance. But anyway, so she come up there and she had printed out the FMLA papers and she slammed them on my desk and told me I needed to read those. But she screamed it at me. And when she slammed them down, I was just shaking. And when she hollered that at me, she had already been just hollering and screaming and everything, and so when I got up, and when I got up, I did yell back at her that day. And I was shaking. And I told her, I said "Get out of my office." And she ran around and she ran into Steve's office. And my daughter was in the mayor's office, and I said, and I was just shaking and I said, "I have to leave. I just have to leave." And so she came back here and clocked us out and I had to go to the emergency room that day and my blood pressure was sky high, and the doctor there told me that, he said, "Did you yell back?" And I said yes. And he said, "Well it's a good thing you did because you relieved some stress and you probably would have had another stroke if you hadn't of." And he told me, he said, "You don't need to go back." That doctor in the emergency room told me that too, that I didn't need to go back.

(Doc. No. 21-1 at 13-14.)

Ms. Hart also expounded on what she meant when she said her relationship with Ms. Teague further deteriorated after returning to work after the stroke. At her deposition she testified:

> Q        Okay. So when you started to come back to work more frequently, let's talk about that. What was it like when you came back to work?
>
> A        Well, it just got worse. I mean –-
>
> Q        How so?
>
> Q        Okay. Anything else?
>
> A        You need to take care of this, take care of this, this is what you need to do. And you know, take care of this for me, and you need to, this is what you need to get done, you know. Well, I had other things I was getting done, you know.
>
> Q        Okay. So she would ask you to do things, and you felt like you didn't have to do them cause you had to do other things?
>
> A        Right.
>
> Q        Okay.
>
> A        But that's not really how you ask someone.

> Q       So it was how she was asking?
>
> A       Uh-huh.

(*Id.* at 23-24.)

Evidence of record shows Ms. Teague had conflicts with other City personnel. (Doc. No. 22 at 6-8.) At her deposition, Ms. Hart recounted several other employees that had "arguments" with Ms. Teague. (Doc. No. 21-1 at 28-30.)

Ms. Hart sought an accommodation for her disability by way of having Ms. Teague "leave her alone." (*Id.* at 9.) At her deposition, Ms. Hart responded, "Yes," when her counsel asked, "If getting somebody to leave you alone because her treatment of you is having an adverse effect on your health as it relates to the stroke/blood pressure/migraine type issues, did you request accommodation?" (Doc. No. 21-1 at 34-35.)

City employees and the Mayor tried to find ways to separate Ms. Hart from Ms. Teague, but those attempts were unsuccessful due to logistical issues. (*Id.*) The conflict continued. Then at a City Council meeting on November 17, 2015, Ms. Teague inquired about how many hours an employee was required to work to be considered full-time for purposes of pay and benefits. (*Id.* at 10.) The Council responded that if an employee was considered full-time, they would receive the usual pay and benefits regardless of hours worked. (*Id.* at 11.) Ultimately, on January 6, 2016, Ms. Hart resigned from her job stating, "The stress of this office has caused me numerous health issues and continues to increase every day. . . Maxine Teague, has caused such a hostile environment in this office that I feel it is too much to endure so I must resign as Kensett Court Clerk for my health and my future." (Doc. No. 21-2.)

IV.	ANALYSIS

A.	Time Bar

Defendants say Ms. Hart's ADA/ACRA claims are time barred.  (Doc. 20 at 3-4.)  On March 21, 2017, the U.S. Equal Employment Opportunity Commission issued its Dismissal and Notice of Rights letter.  (Doc. No. 21-13.)  The letter was addressed to Plaintiff with courtesy copies to her counsel and defense counsel.  (*Id.* at 1.)  Plaintiff filed her Complaint on June 22, 2017 – ninety-three days thereafter.  Both sides agree Ms. Hart had ninety days to file this cause of action and that time began running from the date Ms. Hart *received* the Dismissal and Notice of Rights letter.  *See* 42 U.S.C. §§ 2000e-5(f)(1) and 12117(a); Ark. Code Ann. § 16-123-107(c)(4).

Historically, the three-day mailing rule has served to provide a presumptive date for commencement of the limitations period when the actual date of receipt of the right-to-sue letter is disputed or unknown.  Plaintiff argues she is *automatically* entitled to the benefit of the *assumption* of "a three-day delivery period" pursuant to Federal Rule of Civil Procedure 6(e), citing *Thomas v. Bet Sound-Stage Restaurant/Brett Co., Inc.*, 61 F.Supp.2d 448, 453 (D.Md. 1999).  (Doc. No. 23 at 21.)  However, Rule 6 of the Federal Rules of Civil Procedure has been amended since the decision in *Thomas* and Rule 6(e) no longer exists.  Federal Rule of Civil Procedure 6(a) eliminates the automatic three-delivery period for electronic filers, but I recognize Rule 6(d) states, "3 days are added after the period would otherwise expire under Rule 6(a)."

The letter gave Plaintiff explicit instructions on how to act to "avoid any question that [she] did not act in a timely manner."  (Doc. No. 21-13 at 2.)  The letter states, "Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed within 90 days of the date this Notice was mailed to you (as indicated where the Notice is signed)

6

or the date of the postmark, if later." (*Id.*) Ms. Hart says, "I don't recall when I received a right to sue letter." (Doc. No. 23-1 at 185.) Therefore, I find this issue to be a close-call. But since there has been no allegation or evidence presented by either party as to when Ms. Hart actually received the letter, the date of actual receipt is unknown, and Plaintiff is entitled to the presumption that she did not receive the notice until March 24, 2017 – three days following issuance of the letter. Accordingly, the Motion should be DENIED on this point.

### B.  Official Capacity Claims

Plaintiff has sued Ms. Teague and Mayor Edge in their official capacities and sued the City of Kensett. The defense argues this is a "legal-redundancy," so the official capacity claims should be dismissed. (Doc. No. 20 at 5.) Plaintiff responds, "That is fine, so long as they are dismissed without prejudice, and their dismissal does not function to dismiss the City of Kensett." (Doc. No. 23 at 1.) Accordingly, Defendants' Motion on this point is GRANTED and the official capacity claims against Defendants Teague and Edge are dismissed.[1] Additionally, Defendants Teague and Edge, individually, were not Plaintiff's employers, so under the ADA and ACRA, the individual capacity claims against them are dismissed.

### C.  ADA/ACRA Discrimination

####   1.  Direct Evidence

Plaintiff argues that the *McDonnell Douglas* burden-shifting framework does not apply. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff says, "Defendant spends considerable time arguing a *McDonnell Douglas* theory of the case, but that theory is inapplicable,

---

[1] I recognize Plaintiff agrees to dismissal without prejudice. However, I find dismissal with prejudice is appropriate given my conclusion that Ms. Hart has failed to show a *prima facie* case of discrimination.

because the claims are for hostile work environment, constructive discharge, and failure to accommodate, none of which use a *McDonnell Douglas* proof structure." (Doc. No. 23 at 2.) But Ms. Hart must provide "either direct evidence of discrimination or create an inference of it under the *McDonnell Douglas* burden-shifting framework" to defeat Defendants' Motion for Summary Judgment. *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (citation omitted); see also *Stewart v. Ind. Sch. Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007) ("Without direct evidence of a retaliatory motive, we analyze retaliation claims (whether under Title VII, the ADA, or the ADEA), under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).").

Ms. Hart will survive summary judgment on her ADA claims by presenting direct evidence of discrimination. *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1034 (8th Cir. 2007). "'[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Id.* (*quoting Griffith v. City of Des Moines*, 387 F.3d 733, 736-37 (8th Cir. 2004)). "'[D]irect' refers to the causal strength of proof, not [to] whether it is 'circumstantial' evidence." *Griffith*, 387 F.3d at 736. If direct evidence exists, the *McDonnell Douglas* burden-shifting framework is not necessary for Plaintiff to get her case to the jury. Ms. Hart is entitled to get to the jury based on that evidence alone. *Id.*

Ms. Hart's specific evidence of discrimination is that Ms. Teague: 1) told her she should quit and file for disability benefits; 2) made official inquiry about Ms. Hart receiving full pay and benefits while working part-time; and 3) printing FMLA papers, slamming them on Ms. Hart's desk, and telling her she needed to read them. Regarding the slamming of the FMLA papers, when asked if that occurred "like November or December, 2015," Ms. Hart testified, "It could have been.

8

I really don't have any idea." (Doc. No. 21-1 at 14-15.)  And it was "[a]t the City Council meeting on November 17, 2015, Ms. Teague addressed the council regarding holiday and vacation pay." (Doc. No. 21-6 at 3.)  Ms. Hart resigned from her job on January 6, 2016.

While not good examples of effective leadership, in carefully considering Ms. Hart's claims, I find these events fail to amount to *direct evidence of discrimination*.  An example of direct evidence can be found in the *Young-Losee* case, *supra*, where her employer wadded up a formal complaint of harassment, called it "total bullshit," threw it in the garbage can, told her to leave, and said he never wanted to see her again.  *Young-Losee*, 631 F.3d at 912.  Another example comes from *Coffman v. Robert J. Young Co., Inc.*, 871 F. Supp.2d 703 (M.D. Tenn. 2012), where the plaintiff received a termination letter stating "given [that] you are unable to perform the tasks of your job, we have found it necessary to hire someone to fill the vacancy created by your need to take long term disability" and "[d]ue to your long term disability we must terminate your employment."  *Id.* at 709.  In viewing the evidence in the light most favorable to Ms. Hart, I find no direct evidence of discrimination.

2.   Inferential Evidence

*McDonnell Douglas, supra,* requires a plaintiff alleging disparate treatment or retaliation under the ADA to first establish a *prima facie* case of discrimination.  To prove a *prima facie* case of discrimination, Ms. Hart must show she: "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [her] disability."  *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014) (quotation omitted).

The parties do not dispute that Ms. Hart meets the first two elements.  Rather, the defense argues Ms. Hart fails to meet the third element.  I agree.

On this issue, I find Ms. Hart's deposition testimony to be most compelling. Ms. Hart testified the friction with Ms. Teague began ". . .when we moved down here, and it got worse after we got down here. And then after I had my stroke it got even, well, before, right before I had my stroke it got more tense." (Doc. No. 21-1 at 7.) Ms. Hart admits that her relationship with Ms. Teague was generally "tense" all along, but specifically admits "it got worse . . . before, right before" her stroke. (*Id.*) As previously recited, Ms. Hart also testified she believed things were "more stressful" because Ms. Teague was "working two jobs." (*Id.* at 8.) Based on her own testimony, I find Ms. Hart fails to show her adverse employment action was because of her disability.

D.    **Retaliation**

To establish a *prima face* case of retaliation, Ms. Hart must show: "(1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity." *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013). "Once the plaintiff establishes this *prima facie* case, then a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Prod. Fabricators*, 763 F.3d at 969. "If such reason is provided, the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *Id*.

On this claim, Ms. Hart fails to provide the necessary temporal proximity between the protected conduct and the adverse employment action. Ms. Hart returned to full duty in September 2015, and resigned on January 6, 2016. The specific events alleged occurred too far removed from her resignation to be considered sufficient evidence of discrimination. "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required

10

to present a genuine issue of fact on retaliation." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (quotation and citation omitted). Temporal proximity between Ms. Hart's time off for her stroke and her resignation "must be very close" for timing alone to be sufficient. *Id.* (quotation and citation omitted). Although the Eighth Circuit has not "drawn a definitive line," the court has recognized that "[m]ore than two months is too long to support a finding of causation without something more." *Id.* at 901 (*citing Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1088 (8th Cir. 2010) (finding one month is not close enough); *Wisbey v. City of Lincoln*, 612 F.3d 667, 676 (8th Cir. 2010) (same); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) ("[Fourteen days was] sufficient, but barely so, to establish causation, completing [the plaintiff's] *prima facie* case.")).

### E.     Failure to Accommodate

As Plaintiff correctly argues, the *McDonnell Douglas* framework does not apply to Plaintiff's failure-to-accommodate allegation, ". . . because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive. The *McDonnell Douglas* line of cases, however, is aimed at fleshing out this elusive factual question of intentional discrimination." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (quotation omitted). For failure-to-accommodate claims, a modified burden-shifting analysis is used and a plaintiff "must establish both a *prima facie* case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). The plaintiff then has the burden to show "that the requested accommodation is 'reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" *Peebles*, 354 F.3d at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). "Upon such a showing, the employer is left to 'show special (typically case-specific) circumstances that

demonstrate undue hardship in the particular circumstances.'" *Id*. (*quoting Barnett*, 535 U.S. at 402).

I have already found Ms. Hart has failed to show a *prima facie* case of discrimination. Therefore, her failure to accommodate claim is also without merit.

### F. Hostile Work Environment

The United States Court of Appeals for the Eighth Circuit first recognized a hostile work environment under the ADA in *Shaver v. Independent Stave Co.*, 350 F. 3d 716 (8th Cir. 2003). The Court stated, "To be entitled to relief, it seems to us that [a plaintiff] must show that [she] is a member of the class of people protected by the statute, that [she] was subject to unwelcome harassment, that the harassment resulted from [her] membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of [her] employment." *Id.* at 720.

Again, the record reveals Ms. Hart may have been subjected to unwelcome harassment. However, I find insufficient evidence to support a *prima facie* case that this harassment was based on her being disabled. I, therefore, find that Plaintiff's hostile workplace claim must be dismissed.

### G. Constructive Discharge

"A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions." *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir. 1999) (citing *Hukkanen v. Int'l Union of Operating Eng'rs*, 3 F.3d 281, 284-85 (8th Cir.1993)). "Additionally the plaintiff must subjectively perceive the environment to be abusive." *Johnson v. Runyon*, 137 F.3d 1081, 1083 (8th Cir. 1998) (citations omitted). But Ms. Hart can only fully satisfy the intent

requirement by demonstrating that she quit as a reasonably foreseeable consequence of her employer's discriminatory actions. *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996) (citing *Hukkanen v. International Union of Operating Eng'rs*, 3 F.3d 281, 285 (8th Cir. 1993). For the foregoing reasons, Ms. Hart has failed to show her resignation was a result of her employer's discriminatory actions and her constructive discharge claim must be dismissed.

### H. Rehabilitation Act

Although the ADA has no federal funding requirement, "it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable.'" *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (quoting *Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996)). But the Rehabilitation Act "imposes a requirement that a person's disability serve as the sole impetus for a defendant's adverse action against the plaintiff." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1029 n. 5 (8th Cir. 1999); see also 29 U.S.C. § 794(a). As previously discussed, Ms. Hart has failed to show her disability was the sole impetus for adverse employment action and this claim must be dismissed.

### I. Tort of Outrage

I have carefully considered the parties' briefs on this claim. I find Plaintiff wholly fails to submit a *prima facie* claim of outrage under Arkansas law.

## IV. CONCLUSION

IT IS, THEREFORE, ORDERED THAT:

1. Defendants' Motion for Summary Judgment (Doc. No. 19) based on the statute of limitations is DENIED; the Motion is GRANTED in all other respects.

2. Plaintiff's claims against Defendants are DISMISSED with prejudice.

3. Plaintiff's cause of action is dismissed with prejudice.

SO ORDERED this 15th day of October, 2018.

                                                                        _____
JOE J. VOLPE
UNITED STATES MAGISTRATE JUDGE